IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL ACTION NO. |
| v. | |
| | 1:19-cr-326-AT-CMS |
| RODNEY DWAYNE BRENDLE, | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

This case is before the Court on Defendant Rodney Dwayne Brendle's motion and first supplement to motion to suppress evidence based on the warrantless search of his car [Docs. 27, 34], and his motion to suppress cell phone evidence seized pursuant to a search warrant [Doc. 33]. For the reasons that follow, I will recommend that these motions be denied.

## I. Motion to Suppress Based on the Warrantless Search of the Car

Brendle contends that his Fourth Amendment rights were violated when Georgia State Patrol ("GSP") officers searched his car without a warrant, following a traffic stop. [Docs. 27, 34]. I held an evidentiary hearing on October 19, 2020, and a transcript was prepared. [Doc. 98 ("Tr.")]. Following the hearing, Brendle filed a supplemental brief, the Government responded, and Brendle filed a reply brief. [Docs. 99, 103, 104].

### A.    Facts Presented at the Evidentiary Hearing

At the evidentiary hearing, Drug Enforcement Administration ("DEA") Special Agent Telita Huffman testified that in June 2019, the DEA was investigating a suspected drug trafficker named Alexis Ortiz.  [Tr. at 8–9, 38].  The investigation had obtained a wiretap for Ortiz's phone, which showed that Ortiz was distributing ten to fifteen kilograms of methamphetamine on a daily basis, and Ortiz had sold one kilogram of methamphetamine to an undercover agent.  [*Id.* at 9]. As a result, they planned on arresting Ortiz on June 14, 2019.  [*Id.* at 9–10].

Special Agent Huffman testified that on June 14, 2019, a large team of law enforcement officers—approximately fifteen DEA agents, three or four GSP troopers, and some officers from the Doraville Police Department—assembled to discuss a plan to arrest Ortiz and obtain probable cause to search his apartment.  [Tr. at 8–9].  Special Agent Huffman testified that law enforcement was working with a confidential source who was a trusted member of the drug trafficking organization and acted as a taxi driver for Ortiz.  [*Id.* at 11].  Based on their investigation and Ortiz's typical behavior, the agents expected that later that day Ortiz would ask the confidential source for a ride, would conduct a drug deal, would then return home, and would do another drug deal later that day.  [*Id.* at 10–11].  If Ortiz behaved as

they expected, the officers hoped that their surveillance that day would yield probable cause to arrest Ortiz and to search his apartment. [*Id.*].

Part of the plan was to use GSP troopers to pull over and search cars that were suspected of being part of narcotics transactions. [Tr. at 10]. GSP Trooper Brodie Forrester, the officer who would later pull Brendle over and search his car, testified that he was contacted by the DEA mid-morning on June 14, 2019 and was told that the DEA wanted him to assist with a traffic stop. The agents provided him with a location and a rough time frame to be in that area. [*Id.* at 113].

Following the meeting, several members of the team began conducting surveillance at Ortiz's Doraville apartment around 11 a.m. [Tr. at 8, 38]. Special Agent Huffman testified that during this time, the team disseminated information among its members, including Trooper Forrester, via both the messaging app WhatsApp and via the DEA radio.[1] [*Id.* at 16, 32–34, 75–76, 182–83; Gov. Ex. 4 at 3]. Trooper Forrester was added to the WhatsApp group message at 11:01 a.m. [Tr. at 114; Gov. Ex. 4 at 1].

Shortly after the surveillance began (and as the agents expected), Ortiz called the confidential source and said he needed a ride. The confidential source sent

---

[1] A transcript of the WhatsApp messages was admitted into evidence as Government Exhibit 4. [Tr. at 32; Doc. 109-4].

3

Special Agent Huffman a text message advising her of this development.[2]  [Tr. at 12; Doc. 109, Gov. Ex. 1 at 1].  The officers who were conducting surveillance observed the confidential source arrive at Ortiz's apartment in a gray Toyota Highlander (hereinafter "the taxi") and saw Ortiz get into the taxi with some bulky items concealed under his waistband.  [Tr. at 12, 39–40].  Special Agent Huffman testified that a group of agents and task force officers followed the taxi to an apartment complex in Norcross, Georgia where Ortiz met with a red Tacoma pickup truck.  [Tr. at 12–13, 39–41; Gov. Ex. 4 at 2].  According to the confidential source, Ortiz exchanged money for approximately six kilograms of methamphetamine.  [Tr. at 13].  Special Agent Huffman testified that after this transaction, the confidential source drove Ortiz back to his apartment where Ortiz exited the taxi carrying a large, black plastic bag that appeared to contain a heavy item, and Ortiz went back into his apartment.  [*Id.*].  Ortiz told the confidential source that he would call him later, which indicated to the source that there would be another narcotics transaction later that day.  [*Id.* at 14].  As for the red Tacoma, the agents attempted to follow it, but the truck conducted countersurveillance tactics, and the officers decided to stop

---

[2] A transcript of the text messages between Special Agent Huffman and the confidential source was admitted into evidence as Government Exhibit 1. [Tr. at 25; Doc. 109-1].

pursuing it because the Tacoma was not the main priority that day. [*Id.* at 13, 45–46; Gov. Ex. 4 at 2]. Trooper Forrester was monitoring the WhatsApp chat discussion about the red truck, and offered his assistance. [Gov. Ex. 4 at 2, entry at 12:40:45 p.m.].

Around 1:40 p.m., the confidential source returned to Ortiz's apartment, and Ortiz got into the taxi carrying a black plastic bag. [Tr. at 15, 47]. Ortiz told the confidential source to drive to a Walmart in Lilburn. [*Id.* at 16, 26, 49; Gov. Ex. 1 at 5]. The source then passed that information to Special Agent Huffman, who disseminated it to the other members of the surveillance team via both the text messaging app WhatsApp and the DEA radio. [Tr. at 16; Gov. Ex. 1 at 5].

The taxi drove directly to the Walmart in Lilburn, and the agents followed. [Tr. at 16]. On the way to Walmart, the confidential source advised Special Agent Huffman that there were going to be two drug transactions—one for one kilogram of methamphetamine and one for two kilograms of methamphetamine. [*Id.* at 18, 26–27, 50–51; Gov. Ex. 1 at 5; Gov. Ex. 4 at 3]. Meanwhile, the DEA relayed this information to Trooper Forrester, advising him that the (as yet unidentified) vehicle he was to stop would potentially be transporting one or two kilos of methamphetamine. [*Id.* at 113–14, 148]. In response, Trooper Forrester headed to the Lilburn Walmart to await further instructions. [Tr. at 113–15]. At 2:01 p.m.,

5

Trooper Forrester advised the WhatsApp chat that he was "getting [on] 85." [Gov. Ex. 4 at 3]. At 2:07 p.m., Trooper Forrester used the WhatsApp chat to inquire as to the status, asking: "Any updates?" [*Id.*]. Two minutes later, at 2:09 p.m., information about the Walmart drug transaction between Ortiz and a man later identified as James Kristoffer Cantley (Brendle's co-defendant) was broadcast to all law enforcement agents on the WhatsApp chat: "One deal is 1kg 2nd deal will be two . . . Kgs." [*Id.*].

When the taxi arrived at the Walmart parking lot, it stopped near a black Dodge pickup truck. [Tr. at 16–18, 27; Gov. Ex. 1 at 5]. A woman got out of the truck, entered the taxi, and then exited the taxi carrying a brown plastic bag. [Tr. at 18; Gov. Ex. 4 at 3]. The woman got back in the truck and drove off. A group of law enforcement officers followed her, intending to conduct a traffic stop, but they lost surveillance on the truck. [Tr. at 18–19].

Special Agent Huffman testified that after the transaction with the woman in the Dodge truck, the taxi then drove to the front of Walmart, at which point Cantley got into the taxi. [Tr. at 19, 27, 52; Gov. Ex. 1 at 6]. At that point, the confidential source was in the driver's seat, Ortiz was in the front passenger seat, and Cantley was in the back seat. [Tr. at 20]. Special Agent Huffman testified that during this time, the confidential source was sending her contemporaneous text messages. [*Id.*

at 20, 27–28, 52–53, 56; Gov. Ex. 1 at 5–6].  The taxi then drove to the middle of the Walmart parking lot and parked next to a small black Honda, during which time Ortiz and Cantley engaged in a narcotics transaction.  [Tr. at 19–21, 28, 53; Gov. Ex. 1 at 6–7; Gov. Ex. 4 at 3].  Cantley then exited the taxi, got into the driver's seat of the Honda, and drove to the front of the Walmart where Brendle and another man—Adam Shane Henderson, another co-defendant—were loitering around the entrance and looking out into the parking lot.  [Tr. at 20–21, 28, 61–65; Gov. Ex. 1 at 6].  During this time, the confidential source was sending contemporaneous text messages the agents:  "Old Honda, custom black tires . . . White guy . . . Batman logo instead of Honda . . . 2 more guys getting in . . . Nc plate . . . ."  [Tr. at 20; Gov. Ex. 1 at 6].  When the Honda pulled up at the front of the Walmart, Cantley slid over to the front passenger seat, Brendle got into the driver's seat, and Henderson got into the rear passenger seat.  [Tr. at 21, 61].  Brendle then drove the Honda to a different part of the parking lot.  [*Id.* at 22, 58, 60].  At that point, agents observed the men pass a black item from the front area of the vehicle to the back area of the vehicle.  [*Id.* at 22, 66–67].  According to Special Agent Huffman, the men then went inside the Walmart, at which point Brendle got in line for Western Union or MoneyGram.  [*Id.* at 23, 67].  Eventually, the three men got back into the

Honda and left the Walmart parking lot, heading toward the highway.  [*Id.* at 23, 67–68].

At 2:21 p.m., the WhatsApp chat advised the group that the deals were done and that the Honda was involved:  "2nd deal done. . . . 2nd car Honda Black NC FER-5468."  [Gov. Ex. 4 at 3].   Trooper Forrester testified that based on the information he had received from the group, he was aware that the Honda had been involved in a one- or two-kilogram methamphetamine transaction.  [Tr. at 113, 116–117, 149].  The DEA then provided Trooper Forrester with the color, make, and registration of Brendle's car, along with the direction of travel.  [*Id.* at 115–16, 149].  Trooper Forrester testified that he spoke directly, either on the phone or on the DEA radio, with an agent "who had actual eyes on the vehicle" in order to positively identify the vehicle that he was being asked to stop.  [*Id.* at 114].  At that point, he contacted the two troopers that were assigned to assist him:  Trooper Sidney Miles and Trooper David Kraeling.  [*Id.*].  Even though the DEA agents suspected that the Honda's occupants had just engaged in a drug deal for one to two kilograms of methamphetamine, they instructed Trooper Forrester to "see a violation and perform a traffic stop that way" to independently develop probable cause to search the car.  [*Id.* at 116–17].

Trooper Forrester testified that he located the Honda and followed it until he

observed the Honda follow too closely behind the vehicle in front of it. [Tr. at 117, 152]. He also ran a check for insurance on the car, which came back with "an unknown status." [*Id.* at 118, 153]. Shortly after 3 p.m., Trooper Forrester activated his emergency lights and performed a traffic stop on the Honda.[3] [*Id.* at 118–19; Gov. Ex. 4 at 4].

The Honda pulled into a parking lot, at which point, Trooper Forrester made contact with the driver, who was later identified as Brendle. [Tr. at 119]. Trooper Forrester asked Brendle for his driver's license and insurance information. In response, Brendle stated that his insurance information was on his phone, and Trooper Forrester asked him to step out of the vehicle with his phone so he could prove insurance coverage on his vehicle. [*Id.* at 119–20]. Trooper Forrester testified that in response to a question about why he was in the area, Brendle gave a confusing

---

[3] Trooper Forrester testified that he conducted the stop on the Honda at the instruction of the DEA agents and also to investigate the traffic infraction and whether the car was insured. [Tr. at 118–19]. Trooper Forrester later determined that Brendle did, in fact, have insurance, and he issued Brendle a warning for following too closely. [Tr. at 120, 153–54]. In his initial brief, Brendle challenged the legality of the stop itself pursuant to *Terry v. Ohio*, 392 U.S. 1, 18-23 (1968), arguing that the officers did not have a reasonable suspicion that he was engaging in criminal activity. [Doc. 34 at 1]. In his post-hearing brief, however, Brendle abandons that argument, focusing instead on the length of the stop (arguing that it was unnecessarily prolonged) and on the search (arguing that there was no probable cause).

response about picking up someone at Kroger and looking for a car to buy. [*Id.* at 120–22]. Trooper Forrester believed that the story was made up, and in his opinion, Brendle appeared to be in a panic. [*Id.* at 122, 145]. The conversation led Trooper Forrester to suspect criminal activity. He then asked Brendle for permission to search the car; Brendle denied consent. [*Id.* at 81, 96, 123]. At that point, Trooper Forrester made the decision to deploy his K-9 partner, Bull, around the vehicle. [*Id.* at 123].

Meanwhile, Trooper Miles and Trooper Kraeling arrived on the scene. [Tr. at 78–80, 94–95]. They escorted the passengers out of the vehicle and kept an eye on them while Trooper Forrester deployed Bull. [*Id.* at 81–82, 96]. According to Trooper Forrester, Bull alerted three times during the sniff. [Tr. at 139, 241–44]. Trooper Forrester testified that based on Bull's alerts, he concluded that there was probable cause to search the car. [*Id.* at 141]. Trooper Forrester and Trooper Kraeling then searched the car, and during the search, they found two bags of suspected methamphetamine and a loaded semiautomatic pistol. [*Id.* at 97–100, 143–44].[4]

---

[4] At the evidentiary hearing, Brendle called Gerry Potter, a former dog handler in the United States Navy, as an expert witness. Potter opined that Bull did not validly alert—and therefore there was no probable cause to search the car—because Bull was not working effectively and because Trooper Forrester "cued" the

## B. Discussion

Under the Fourth Amendment to the United States Constitution, every search or seizure by a government agent must be reasonable. *See* U.S. CONST. amend. IV. Typically, a search or seizure must be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *See Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Warrantless searches are "per se unreasonable" under the Fourth Amendment unless they fall into one of a few well-delineated exceptions. *Katz v. United States*, 389 U.S. 347, 357 (1967); *United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal,

---

behaviors that were later characterized as alerts. [Tr. at 192, 200–01, 212, 218, 222–23]. Potter also opined that Bull did not receive adequate training. [*Id.* at 207]. I have not gone into detail summarizing Potter's testimony because it is not necessary to resolve the instant motion. Nor have I summarized other evidence presented at the hearing concerning the stop, such as how long the men were detained before the car was searched and whether Trooper Forrester was authorized to open an "unlatched" car door to allow Bull to get a better sniff. As explained later in this R&R, I conclude that there was probable cause to search the Honda at the time it left the Walmart parking lot. Given this conclusion, it is not necessary to analyze whether the stop was unnecessarily prolonged or to review the specifics of the dog sniff.

unless the government can show that it falls into one of those limited exceptions recognized by law.").

One such exception is the automobile exception, which provides that a vehicle may be stopped and searched if (1) a car is readily mobile and (2) probable cause exists to believe it contains contraband. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *see also United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). When a search is conducted pursuant to the automobile exception, law enforcement is permitted to "search all parts of the vehicle, and any containers therein, where the object of the search might be found." *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014).

The first prong of the test, vehicle mobility, is easily met because the Honda was being driven at the time it was stopped. As for the second prong, probable cause, the Government provides the following accurate summary of the evidence:

> Through a wiretap, law enforcement knew that Ortiz was selling 10-15 kilograms of methamphetamine a day, and he sold one of the kilograms to an undercover agent. Law enforcement also watched Ortiz conduct a drug transaction earlier in the day and were receiving contemporaneous updates on Ortiz's drug activity from the [confidential source]. The [confidential source] was driving Ortiz around town and was considered reliable because he had provided law enforcement information for the past year that had led to drug seizures and arrests. The information the [confidential source] provided the day of the operation also proved to be accurate as they proceeded throughout the day.

> Just prior to the traffic stop of the Honda, the [confidential source] sent law enforcement a text message that Ortiz had sold two kilograms of methamphetamine to the occupant of the black Honda with the Batman logo (which accurately describes Brendle's vehicle). The [confidential source] was aware of this transaction because he was literally sitting next to Ortiz as he sold Cantley the narcotics, and he dropped Cantley off at the Honda in the Walmart parking lot.

[Doc. 103 at 16].   The Government concludes, and I agree, that "[u]nder these circumstances, law enforcement, as a collective entity, undoubtedly had probable cause to believe that the Honda and its occupants had been involved in a crime, justifying the traffic stop."   [*Id.*].   It is clear that under the totality of the circumstances, there was a "fair probability that contraband or evidence of a crime" would be found in the Honda at the time it was pulled over.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002).

In his post-hearing briefs, Brendle does not challenge the two elements necessary for the automobile exception to apply, i.e., that the Honda was "readily mobile" and that probable cause existed to believe that the car contained contraband or evidence of a crime.  Rather, Brendle argues that Trooper Forrester could not have lawfully searched the Honda because he was not personally aware of all the facts that amounted to probable cause.  [Doc. 99 at 16].  Brendle argues that the search was improper because the officers who actually conducted the search could not have

independently articulated facts supporting probable cause before they searched the car.  [*Id.*].  This argument, however, ignores the collective knowledge doctrine.

The collective knowledge doctrine provides that when a group of officers is working on the same investigation, "[p]robable cause . . . exists where the facts and circumstances within the collective knowledge of law enforcement officials, of which they had reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) (citation omitted).  The collective knowledge of all the officers can be imputed to a single officer who conducts the stop and search provided that the officer "maintained at least a minimal level of communication during [the] investigation."  *See id.*  Thus, where, like here, the officer who makes the stop does not have full knowledge of all the facts that comprise probable cause, "the validity of the stop and subsequent search rises and falls on the level of communication between the officer who conducted the stop and the other law enforcement officers who were aware of the facts establishing probable cause." *United States v. Kahn*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *6 (N.D. Ga. May 15, 2018).

The evidence showed that Trooper Forrester was in communication with the DEA task force for several hours before making the stop.  [Tr. at 32–33, 113, 182–

84; Gov. Ex. 4 at 1]. The DEA kept him informed of the progress of the investigation via WhatsApp, and the transcript of the WhatsApp chat demonstrates that Forrester was actively monitoring the group message during that time. [*Id.* at 114, 148; Gov. Ex. 4 at 2–3]. For example, Trooper Forrester sent a message to the group at 12:40 p.m., offering help with the red truck and again around 2 p.m. when he was in the vicinity of the Walmart. [Gov. Ex. 4 at 2–3]. He testified that he spoke directly with a DEA agent "who had actual eyes on the vehicle" in order to positively identify the vehicle that he was being asked to stop. [Tr. at 114]. Through these communications, he was aware of some of Ortiz's drug-dealing activity earlier in the day as well as the drug deal involving the black Honda at the Walmart. [*Id.* at 34–35, 114; Gov. Ex. 4 at 3]. Although Forrester testified that the DEA did not directly tell him "what facts they observed or accumulated in the course of their investigation that would cause them to believe [the methamphetamine] was there," he also testified that he did know that "there was one-to-two kilos of methamphetamine in the [Honda] prior to the traffic stop." [Tr. at 150-51].

Other judges in this district have concluded that this level of communication is sufficient to meet the threshold necessary to permit the Government to rely on the collective knowledge doctrine. *See, e.g., United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding

15

sufficient communication where the DEA coordinated with GSP prior to the operation, communicated with the GSP during the operation, and directed the GSP to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *United States v. Khan*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *7 (N.D. Ga. May 15, 2018) (finding sufficient communications where DEA contacted the trooper prior to the stop, the trooper was on stand-by on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Agarwal*, No. 1:17-CR-43-TCB-RGV, 2018 WL 3061923, at *10 (N.D. Ga. Apr. 6, 2018) (finding sufficient communication where the DEA contacted GSP for assistance, the trooper attended the DEA briefing on the morning of the scheduled buy, and the trooper was in communication with the DEA by phone or radio throughout the day to learn the description and movement of the vehicle as well as the timing and location of the transaction), *adopted by* 2018 WL 2181620 (N.D. Ga. May 11, 2018); *United States v. Morris*, No. 1:19-CR-389-LMM-CCB, 2020 WL 7497333, at *1 (N.D. Ga. Nov. 10, 2020) (finding sufficient communication where the DEA made arrangements to have sheriff's deputies in the area to assist with a traffic stop, the DEA "generally informed" a sergeant about the drug investigation and that it involved a large quantity of methamphetamine, and the

sergeant then relayed the information to a deputy who conducted the stop), *adopted by* 2020 WL 7495610 (N.D. Ga. Dec. 21, 2020); *United States v. Hernandez*, 17 F. Supp. 3d 1255, 1260 (N.D. Ga. 2014) (collective knowledge doctrine applied where the officers "with knowledge of the investigation" directed another officer, who testified at the hearing that he was aware of the federal investigation, to make the traffic stop).

In seeking to avoid application of the collective knowledge doctrine, Brendle first argues that the Eleventh Circuit in *Willis* did not intend that collective knowledge could be imputed to a single officer. [Doc. 99 at 18]. Instead, Brendle contends that the Eleventh Circuit intended that in order for communications to be sufficient to trigger the collective knowledge doctrine, the information communicated must be "imparted" to the officer. Brendle asserts that for the search to be valid, the DEA agents must have ***imparted*** the full and complete probable cause basis for the search to Trooper Forrester. [*Id.* at 19]. Brendle cautions this Court not to be "misled" by the Eleventh Circuit's purportedly erroneous use of the word "impute." [*Id.*]. He provides no caselaw to support this argument, and I see no logical or legal basis to adopt it.

Brendle next argues that to the extent the collective knowledge doctrine might apply, it should be limited to *Terry* stops (that require only articulable suspicion),

17

rather than searches (that require probable cause), citing to *United States v. Glinton*, 154 F.3d 1245 (11th Cir. 1998). [Doc. 99 at 17, 23]. There, task force officers observed the driver of a car meet with a known drug dealer and depart carrying a bag. They then radioed that information to two other officers who made the stop. *Glinton*, 154 F.3d at 1257. The Eleventh Circuit held that the knowledge of the collective amounted to reasonable suspicion that justified a *Terry* stop, but the Court also noted that the officers who stopped the car were required to develop their own probable cause to justify a search of the vehicle. *Id.* at 1257–58. Contrary to Brendle's argument, the Eleventh Circuit's requirement that the officers develop their own independent probable cause was not a rejection of the collective knowledge doctrine, but rather was a reflection of the amount of evidence that the collective had in that particular case. In *Glinton*, the investigating officers had only seen the driver meet with a drug dealer and leave with a bag. The Eleventh Circuit held that on those facts, the knowledge of the collective amounted to reasonable suspicion, which was sufficient to stop the car, but did not reach the higher probable cause standard that was necessary for a search. *Id.* In contrast, the evidence of criminal activity in Brendle's case that I have detailed above is much more robust that the evidence in *Glinton*, and easily amounted to probable cause.

Finally, Brendle relies on a R&R that I issued in *United States v. Khan*, in which I recommended that a motion to suppress be granted where a GSP trooper stopped a car being driven by a suspect in a DEA investigation. *See United States v. Khan*, No. 1:17-CR-40-SCJ-CMS, 2017 WL 9605113 (N.D. Ga. Dec. 11, 2017). The facts upon which I based my R&R in *Khan*, however, are distinguishable from the facts presented here. In the evidentiary hearing that I held in *Khan*, the Government did not provide any evidence whatsoever about what the GSP trooper might have known or what communications he might have had with the DEA agents before the stop. The GSP trooper in that case did not testify at the evidentiary hearing, and the Government presented no direct evidence to show that the trooper had any knowledge whatsoever about the DEA's undercover investigation or that he was acting on DEA instructions. [*Id.* at *4]. I concluded that the Government had failed to show any level of communication between the DEA agents and the GSP trooper who made the stop, and my recommendation to grant the motion to suppress was based on this "fatal void in the evidence." [*Id.*]. Here, in contrast, there is no such void. On the contrary, there is ample evidence to show that Trooper Forrester was part of the team, was actively in communication with the DEA for several hours

on the date in question, and made the stop based on the DEA's request.  Thus, the

reasoning of my R&R in *Khan* does not support Brendle's position.[5]

For the reasons discussed above, I conclude that (1) the group of officers

working on the Ortiz investigation on June 14, 2019 had probable cause to believe

that contraband or evidence of a crime would be found in Brendle's car after he

drove out of the Walmart parking lot; (2) the knowledge of the group of officers can

be imputed to Trooper Forrester pursuant to the collective knowledge doctrine; and

(3) the Honda was "readily mobile."  As such, the automobile exception to the

warrant requirement applies, and there was no Fourth Amendment violation.  The

motion and first supplement to motion to suppress should be denied on this basis.[6]

---

[5] Moreover, the district judge declined to adopt my R&R and reopened the evidence.  After hearing additional evidence—evidence that filled the void I had identified—the district judge denied the motion to suppress, concluding that the collective knowledge doctrine did, indeed, apply.  *See United States v. Khan*, 2018 WL 2214813, at *7 (N.D. Ga. May 15, 2018).

[6] In Brendle's post-hearing brief, he raises the following additional arguments: (1) that Trooper Forrester unnecessarily prolonged the traffic stop in order conduct the dog sniff; (2) that by opening the door during Bull's sniff, Trooper Forrester tainted the results of the sniff; and (3) that the behaviors Trooper Forrester described as "alerts" do not amount to probable cause because Bull is not reliable and because he was responding to his handler's cues.  [Doc. 99 at 25–33].  Because the automobile exception applies, these arguments cannot change the result, and for that reason, I have not addressed them.  If the district judge disagrees and would like me to conduct further analysis of any or all of these arguments, the case can be re-submitted to me and I will promptly supplement my R&R.

## II.    Motion Challenging the Cell Phone Warrant

Also pending before the Court is Brendle's motion challenging a search

warrant that I signed on July 3, 2019, authorizing the search of fourteen cell phones

that were seized from Brendle and his co-defendants at the time of their arrest.  [Doc.

33; Doc. 105-1].[7]  Brendle argues that the warrant was not supported by probable

cause [Doc. 33 at 2]; that the cell phone evidence should be suppressed as fruit of

the poisonous tree because of the allegedly "improper search of the car" [*id.* at 3];

and that "the affidavit contains intentionally or recklessly false statements" [Doc.

100 at 1–4].  The Government argues, and I agree, that this motion should be denied

because Brendle has failed to establish standing to challenge the search of any of the

phones.

The Supreme Court has held that a defendant challenging a search or seizure

must establish that he has standing to complain by showing that his own personal

Fourth Amendment rights were violated:

> Fourth Amendment rights are personal rights which, like some other
> constitutional rights, may not be vicariously asserted.  A person who is
> aggrieved by an illegal search and seizure only through the introduction of
> damaging evidence secured by a search of a third person's premises or

---

[7] According to the warrant return, not all of the phones were searched.  [Doc.
105-1 at 18].  To the extent that Brendle makes arguments about any phone that has
not yet been searched [*see, e.g.*, Doc. 107 at 2–6], his motion is denied without
prejudice to his right to revisit the issue if such evidence is later obtained.

> property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978) (internal citations omitted).

Here, Brendle has alleged no facts in any of his briefs to show that he owned, possessed, or even used any of the phones, or to otherwise show that he had a reasonable expectation of privacy in any of the phones. [*See generally* Docs. 33, 100, 107]. Despite having been provided with the opportunity to perfect his motion and to file a reply brief after the Government expressly and clearly raised the standing issue, Brendle has presented neither facts nor arguments to show that he had a reasonable expectation of privacy in any of the phones. As such, Brendle's motion to suppress evidence obtained pursuant to the warrant should be denied. *See United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000) (affirming denial of a motion to suppress where the motion did not include any facts that might have demonstrated that the defendant had a reasonable expectation of privacy in the location searched).[8]

---

[8] In his reply brief, Brendle appears to concede the standing issue, stating that he now "relies only on the fruit of the poisonous tree doctrine." [Doc. 107 at 2]. To the extent that Brendle claims that the cell phone evidence should be excluded as fruit of the poisonous tree, this argument fails based on my conclusion above that the search of the car was proper.

### III.    Conclusion

For the foregoing reasons, I **RECOMMEND** that Brendle's motion and first supplement to motion to suppress evidence related to the warrantless search of the car [Docs. 27, 34] be **DENIED** and that his motion to suppress evidence obtained from the cell phone warrant [Doc. 33] also be **DENIED**.  I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial.   Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED**, this 5th day of February, 2021.


CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE